**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**TOMMIE CROSBY,**

                    **Plaintiff,**           **18-cv-9470 (JGK)**

      **- against -**

**M.D. KEVIN PETERMANN, ET AL.,**           **MEMORANDUM OPINION AND**
                                      **ORDER**

                   **Defendants.**

**JOHN G. KOELTL, District Judge:**

The plaintiff, Tommie Crosby, brings this pro se action pursuant to 42 U.S.C. § 1983 against the defendants, alleging that his constitutional rights were violated when the defendants failed to inform him that he had hepatitis A, B, and C when he was detained in the custody of the City and State of New York. He brings this action against two New York City employees, Dr. Kevin Petermann and Physician's Assistant ("P.A.") Christopher LaRosa (collectively, "City Defendants"). He also brings this action against ten New York State employees, Drs. Mario Malvarosa, Nancy Ryerson, McCarthy, Debra Greer, G. Ripich, Kyoung Kim, and Tim Nguyen; Dr. Carl J. Koenigsmann, the Chief Medical Officer of the New York State of Correctional and Community Services; Jaifa Collado, the Acting Superintendent of the Green Haven Correctional Facility; and Corrections Officer P.L. McNeil (collectively, "State Defendants"). The plaintiff

1

brings this case against all twelve defendants in their individual and official capacities.

## I.

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). The Court should not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions." Id. When presented with a motion to dismiss pursuant to Rule 12(b)(6),

2

the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).

Where, as here, the plaintiff is proceeding pro se, the Court is required "to read [the plaintiff's] pleadings . . . liberally and interpret them to raise the strongest arguments that they suggest." McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (internal citation and quotations omitted).

## II.

The following factual allegations are accepted as true for purposes of the pending motion.

In 1995, prior to the events underlying this lawsuit, the plaintiff was diagnosed with hepatitis C when he was incarcerated at the Attica Correctional Facility. He alleges that for ten years, certain medical providers, none of whom are defendants in this case, had not given him proper medical care to treat his hepatitis C. Compl. 6.[1]

The plaintiff was arrested on December 1, 2014 and was remanded to the custody of the City of New York. Compl. 7, ¶ 2.

---

[1] The format of the citations to the complaint in this case is as follows: Compl. ECF page number, ¶ number (if any).

At this time, the plaintiff was a pretrial detainee. Id. at 7, ¶ 4. On December 3, 2014, the plaintiff had an intake appointment with Dr. Kevin Petermann at the Manhattan Detention Complex, during which he declined to receive a hepatitis B vaccine. Id. at 7-8, ¶¶ 3-4. Dr. Petermann also ordered a blood test for hepatitis C. Id. at 8, ¶ 4. Dr. Petermann's notes reflect that on December 3, 2014, he administered a routine medical exam and ordered a "LAB: HEPATITIS C ANTIBODY, EIA" test for the plaintiff. Id. at 37. The results of that test came back on December 7, 2014, as "Abnormal/Positive/Reactive." Id. at 40. The plaintiff alleges that these results mean that his results were "abnormal for the very deadly Hepatitis C viruses." Id. at 8, ¶ 4. A "confirmatory test" with a medical follow up was scheduled. Id. at 40.

On December 7, 2014, the plaintiff returned to the medical clinic, complaining of nausea, loss of appetite, abdominal pains, and headaches, for which he was prescribed vitamins, aspirin, and Robaxin. Id. at 8-9, ¶ 7. On December 9, 2014, he returned again, complaining about flu-like symptoms, and was prescribed Benadryl and flu medication. Id. at 9, ¶ 8. On December 12, 2014, the plaintiff returned, explaining that his mother had passed away and that he had depression, but did not receive any further treatment for mental illness. Id. at 9, ¶ 9.

4

On May 12, 2015, P.A. Christopher LaRosa reviewed the plaintiff's medical records for a facility transfer. Id. at 48. P.A. LaRosa's medical notes from his review stated "abn HCV antibody EIA but normal HCV RNA qualitative bDNA" under the "pertinent lab/DI abnormalities" section. Id.

On or about July 8, 2015, the plaintiff went to the medical infirmary on Riker's Island while experiencing stomach pains, flu-like symptoms, and a rash. Id. at 9-10, ¶ 11. P.A. LaRosa prescribed him aspirin, Norvasc, and DermaVantage lotion. Id. at 10, ¶ 11. A day later, he saw P.A. LaRosa again for abdominal pain, for which P.A. LaRosa prescribed flu medication and bed rest. Id. at 10, ¶ 12. At no time did any of the City Defendants inform the plaintiff that his bloodwork had returned as abnormal for hepatitis C. Id. at 9, ¶ 10.

On August 6, 2015, the plaintiff was transferred to the custody of the State of New York and was sent to the Downstate Correctional Facility. Id. at 10, ¶ 14. On August 7, 2015, the plaintiff underwent a physical examination at Downstate and his blood was sent for testing by Dr. Malvarosa. Id. at 10-11, ¶¶ 15-16. In the "Clinical Abnormalities Summary" of the clinical report dated August 7, 2015, the results stated

| | |
|---|---|
| HEP. A Ab., Total | Positive |
| HEP. B CORE Ab. | Positive |
| HEP. B SURF. AB. | Positive |
| HEP. C Ab. | Positive |
| HEP C Ab. (S/CO RATIO) | 30.80 HI. |

Id. at 71. The lab report also indicated "HEP. C RNA, (IU)"
results as "<15 ND." Id. at 74. The plaintiff alleges that the
results of the bloodwork showed that he tested positive for
hepatitis viruses A, B, and C, with a very high ratio of 30.80.
Id. at 10-11, ¶ 16. While incarcerated at Downstate, the
plaintiff would visit medical staff for night sweats, loss of
appetite, fatigue, nausea, vomiting, headaches, severe abdominal
pains, vomiting, and diarrhea; the medical staff prescribed some
bowel movement medication and told the plaintiff to drink a lot
of water. Id. at 11, ¶ 17. At no time did the plaintiff receive
care or medical treatment for hepatitis. Id. at 11, ¶ 18.

On or about November 5, 2015, the plaintiff was transferred
to Auburn Correctional Facility. Id. at 11, ¶ 19. On December
17, 2015, the defendant saw Dr. Ryerson for a tuberculosis test,
which came back negative. Id. at 11-12, ¶ 20. The plaintiff saw
Dr. Ryerson soon thereafter for a painful and irritating rash,
for which Dr. Ryerson prescribed topical shampoo and cream. Id.
at 12, ¶ 21. When the plaintiff explained that he was vomiting
and had severe stomach pains, Dr. Ryerson reviewed his medical
folder and said that she didn't see anything wrong with him. Id.
at 12, ¶ 22. On January 4, 2016, Dr. McCarthy also examined the
medical records that Dr. Ryerson examined. Id. at 13, ¶ 23.[2] She

---

[2] It is not clear if the defendant, Dr. McCarthy, has moved to dismiss the
claims against her. The Attorney General of the State of New York did not
include Dr. McCarthy as a defendant on behalf of whom the Attorney General

noted that no action was required. Id. at 81. On July 12, 2016, the plaintiff saw Dr. Greer for a lump in his abdomen and for problems associated with his indigestion and other symptoms like loss of appetite, nausea, fatigue, fever, night sweats, and headaches. Id. at 13, ¶¶ 25-26. Dr. Greer looked through the plaintiff's medical records and recommended that the plaintiff get a flu shot. Id. at 13, ¶ 26. Dr. Greer also said the lump in the plaintiff's abdomen was a normal part of his anatomy. Id. at 13, ¶ 27. On November 17, 2016, the plaintiff saw Dr. Ripich for the lump in his abdomen and explained his other symptoms to Dr. Ripich again. Id. at 14, ¶ 30. Dr. Ripich prescribed the plaintiff Prilosec for his ulcers and did not order any x-rays or do any examination. Id. at 14, ¶ 30. At no point did these defendants tell the plaintiff that he had tested positive for hepatitis C or offer him any treatment. Id. at 14, ¶ 31.

On April 28, 2017, the plaintiff was transferred to Green Haven Correctional Facility. Id. at 15, ¶ 32. He was seen by Dr. Kim for painful rashes and for his other flu-like symptoms. Id. at 15-16, ¶¶ 38-42. Dr. Kim prescribed a topical shampoo and cream, which was the same as what Dr. Ryerson had prescribed when the plaintiff was seen at Auburn Correctional Facility. Id.

was bringing the motion to dismiss, State Defs.' Mem. at 1, and has not entered a notice of appearance on her behalf. However, Dr. McCarthy's involvement is discussed in the Attorney General's briefings. Id. at 3. In any event, because the plaintiff's claims are dismissed in full, the plaintiff's claims against Dr. McCarthy are also dismissed.

at 15, ¶ 39. As to his other symptoms, Dr. Kim reviewed the medical record and concluded that the plaintiff must have eaten something that did not agree with his stomach. Id. at 16, ¶ 42. On June 8, 2017, the defendant was able to review his medical records. Id. at 16, ¶ 45. The plaintiff saw that Dr. Nguyen had written in an Ambulatory Health Record that the plaintiff had tested positive for hepatitis A, B, and C. Id. at 17, ¶ 46. This record was from April 28, 2017. Id. at 85. The Ambulatory Health Record stated, "Hep 'A' Immune," "Hep 'B' Immune 8/14/95," "Hep 'C' + Sustained Viral Response," and "Hep C Rx Tx complete C/2005." Id. at 85.

After reviewing his medical record, the plaintiff filed three separate grievances with the Inmate Grievance Resolution Committee ("IGRC"); these grievances were consolidated into one complaint, under number 86927-17. Id. at 17, ¶¶ 47, 64-65. The plaintiff requested that a copy of his grievances be sent to the Chief Medical Officer, Dr. Carl J. Koenigsmann. Id. at 20, ¶ 65; 87-89. As of the date the plaintiff filed his complaint, the plaintiff has not received a response from Dr. Koenigsmann. Id. at 21, ¶ 65. The defendant also alleges that Dr. Koenigsmann has an unwritten policy of restricting, if not outright delaying or denying, prisoners' medical care and treatment when such care and treatment is too expensive. Id. at 24, ¶ 80.

On June 29, 2017, Nurse Administrator Leslie Carey investigated the grievance and sent a memo to the IGRC recording her findings. Id. at 91. N.A. Carey noted that she reviewed the plaintiff's chart and computer records and that the plaintiff had previously tested positive for hepatitis C but reportedly completed treatment in June, 2005. Id. She noted that he had bloodwork done on August 7, 2015, which indicated that he had tested positive for antibodies at a s/co ratio of 30.8, but that there was no more recent bloodwork. Id. On July 11, 2017, the IGRC recommended that the plaintiff receive appropriate medical care and treatment. Id. at 92. Shortly thereafter, the plaintiff had a medical interview with Dr. Kim, who said to the plaintiff that he was cured. Id. at 17-18, ¶ 50. Dr. Kim told the plaintiff, "You're cured right" and "you received treatment back in June 2006." Id. Then, on July 17, 2017, the plaintiff appealed the IGRC's recommendations to the Superintendent. Id. at 18, ¶ 51. On August 29, 2017, Jaifa Collado, the Acting Superintendent, issued a decision denying the grievance. Id. at 100. Collado stated that the plaintiff's records were reviewed by the Nurse Administrator. Id. N.A. Carey, wrote that the plaintiff "was previously" positive for Hep C and that he had reportedly completed treatment in June, 2005 and that there had been no more recent bloodwork since August 7, 2015. Id. at 91, 100. Collado advised that the plaintiff discuss his hepatitis C

issue with his provider. Id. at 100. Collado's decision did not mention that the plaintiff had not received medical care from any of the defendants for hepatitis C. Id. at 18, ¶ 53. The plaintiff subsequently filed an appeal of Collado's decision on August 31, 2017. Id. at 100.

On January 25, 2018, Correction Officer McNeil stopped the plaintiff for a pat and frisk near the law library. Id. at 21, ¶ 69. In his pocket, the plaintiff had a pen, which had been altered, and which he used as a screwdriver to repair his radio. Id. at 21, ¶ 67. The plaintiff was handcuffed and taken to the Special Housing Unit. Id. at 21, ¶ 70. McNeil picked up the plaintiff's civil rights complaint and told his sergeant that the plaintiff was not getting his complaint back. Id. at 21, ¶¶ 69-70. McNeil later told the defendant again that he was not getting his lawsuit back because the plaintiff "lik[ed] filing grievances and lawsuits against our medical staff," id. at 22, ¶ 72, after which the plaintiff filed a grievance against McNeil for stealing his work, id. at 22, ¶ 73. The following week, McNeil confronted the plaintiff about the newly filed grievance, and shouted to all the prisoners in the unit that the plaintiff was infected with hepatitis C. Id. at 22, ¶ 74. The plaintiff alleges that one other prisoner, whose identity the plaintiff did not reveal, heard McNeil's statements about the plaintiff's hepatitis C status. Id. at 23, ¶ 75. The grievance was

ultimately denied on May 22, 2018, after a Superintendent found
that when a weapon was discovered on the plaintiff's person, he
was handcuffed and his "paperwork was placed into a plastic bag
and placed in his property." Id. at 104.

The plaintiff alleges that the City Defendants were
employed by the New York City Department of Correctional
Supervision and that the State Defendants were employed by the
New York State Department of Corrections and Community
Supervision. Id. at 2-4, ¶¶ 2-13.

The plaintiff now brings this action, pursuant to 42 U.S.C.
§ 1983, alleging that the City Defendants and State defendants
Drs. Malvarosa, Ryerson, McCarthy, Greer, Ripich, Kim, and
Nguyen ("State medical providers") violated his Eighth and
Fourteenth Amendment rights by being deliberately indifferent to
his medical needs and not notifying him of his hepatitis A, B,
and C diagnoses and denying him medical care and treatment; that
Dr. Koenigsmann violated his Eighth Amendment rights by not
responding to his grievance and by implementing a policy to
deprive inmates of medical care; that Collado violated his
Eighth Amendment rights by denying his grievance; and that
Correction Officer McNeil violated his First, Fourth, Fifth, and
Fourteenth Amendments when he confiscated the plaintiff's civil
rights complaint and disclosed to other prisoners the
plaintiff's confidential medical information. The plaintiff

seeks compensatory and punitive damages, as well as various forms of declaratory and injunctive relief.

### III.

The plaintiff's claims against the City and State Defendants in their official capacities under 42 U.S.C. § 1983 are **dismissed.**

### A.

A suit against an officer in the officer's official capacity is equivalent to a suit against the entity of which an officer is an agent. See e.g., Kentucky v. Graham, 473 U.S. 159, 165-66 (1985); Biswas v. City of New York, 973 F. Supp. 2d 504, 540 (S.D.N.Y. 2013). To impose Section 1983 liability against a municipality, a plaintiff must identify a municipal "policy" or "custom" that caused the plaintiff's injuries. See generally Monell v. Dep't of Social Servs., 436 U.S. 658, 694 (1978). The plaintiff has alleged, and the City Defendants do not contest, that providers Petermann and P.A. LaRosa are considered employees of the New York City Department of Correction, which is a City agency. Accordingly, claims against the City Defendants in their official capacities must allege that any constitutional harm suffered was the result of a municipal policy or custom. The plaintiff has failed to allege that Petermann and P.A. LaRosa's allegedly unconstitutional acts of deliberate indifference to the plaintiff's medical needs were

caused by any policy by the City. Accordingly, the plaintiff's claims against the City Defendants in their official capacities are **dismissed.**

## B.

The Eleventh Amendment bars a damages action against a State in federal court unless the state consents to such a suit or Congress has validly abrogated the state's immunity. See Kentucky, 473 U.S. at 169. The State of New York has not consented to be sued in federal court under Section 1983, see Trotman v. Palisades interstate Park Comm'n, 557 F.2d 35, 39-40 (2d Cir. 1977), and Congress did not abrogate the states' immunity in enacting Section 1983, see Quern v. Jordan, 440 U.S. 332, 341-42 (1979). A state's immunity extends to state agencies, such as the New York State Department of Corrections and Community Supervision. See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984). "The bar remains in effect when State officials are sued for damages in their official capacity." Kentucky, 473 U.S. at 169; Davis v. New York, 316 F.3d 93, 101 (2d Cir. 2002).[3] Because the plaintiff has alleged, and the defendants do not contest, that the State defendants are employees of the New York State Department of Corrections and

---

[3] The Eleventh Amendment does not bar suits seeking prospective injunctive or declaratory relief against state officials acting in violation of federal law. See Dube v. State Univ. of New York, 900 F.2d 587, 595 (2d Cir. 1990). The plaintiff does seek declaratory and injunctive relief. However, as discussed below, these claims are moot.

Community Supervision, to the extent that the plaintiff is seeking damages against the State Defendants in their official capacities, those claims are **dismissed.**

## IV.

The plaintiff's claims against the defendants in their individual capacities under 42 U.S.C. § 1983 are also **dismissed.**

## A.

The plaintiff first brings claims pursuant to the Eighth and Fourteenth Amendments alleging that the City Defendants and the State medical providers were deliberately indifferent to his medical needs.

"The Cruel and Unusual Punishments Clause of the Eighth Amendment imposes a duty upon prison officials to ensure that inmates receive adequate medical care." Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006). A prison official violates the Eighth Amendment for deliberate indifference to a serious threat to the health or safety of a person when two requirements are met. The first requirement is objective; it requires that a prisoner was actually deprived of medical care and that the inadequacy in medical care was sufficiently serious. See id. at 279-80. A deprivation is deemed serious if "a condition of urgency, one that may produce death, degeneration, or extreme pain exists." Simpson v. Oakes, 640 F. App'x 86, 87-88 (2d Cir. 2016) (summary order) (citing Hathaway v. Coughlin, 99 F.3d 550,

553 (2d Cir. 1996)). "A prisoner must first make this threshold showing of serious illness or injury in order to state an Eighth Amendment claim for denial of medical care." Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003). The second requirement is subjective; it requires that the official act with deliberate indifference to inmate health. Deliberate indifference is equivalent to subjective recklessness, as the term is used in criminal law, and requires "that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." Salahuddin, 467 F.3d at 280. Mere negligence in diagnosis or treatment, including medical malpractice, is insufficient to state a valid Eighth Amendment claim. See Estelle v. Gamble, 429 U.S. 97, 105-06 (1976). If a defendant's belief that the defendant's conduct poses no risk of serious harm is sincere, the defendant's mental state may be "nonculpable," even if it is "objectively unreasonable." Salahuddin, 467 F.3d at 281.

The plaintiff states in his complaint that when he was in the custody of the City, he was a pretrial detainee. A City pretrial detainee's claims are evaluated under the Due Process Clause of the Fourteenth Amendment because pretrial detainees "have not been convicted of a crime and thus may not be punished in any manner—neither cruelly and unusually nor otherwise." Darnell v. Pineiro, 849 F.3d 17, 29 (2d Cir. 2017) (internal

quotation marks and citations omitted). There is nothing in the
record to indicate when the plaintiff was convicted of a crime
and when he ceased to become a pretrial detainee. The State
Defendants do not contest that his claims should be analyzed
under the Eighth Amendment. Accordingly, the plaintiff's claims
for deliberate indifference are analyzed under the Fourteenth
Amendment for City Defendants and the Eighth Amendment for State
Defendants.

A claim of deliberate indifference under the Fourteenth
Amendment also has two requirements. The standard for the
objective prong of deliberate indifference claims is the same
for the Eighth and Fourteenth Amendments. See Darnell, 849 F.3d
at 30; see also Simmons v. Mason, No. 17-CV-8886, 2019 WL
4525613, at *9 (S.D.N.Y. Sept. 18, 2019). For claims brought
under the Fourteenth Amendment, the second prong also requires
that the official act with a sufficiently culpable state of
mind; however, this mental state requires only that the charged
official show recklessness, which is defined objectively. See
Figueroa v. Cty. of Rockland, No. 16-CV-6519, 2018 WL 3315735,
at *4 (S.D.N.Y. July 5, 2018). Thus, a pretrial detainee need
only prove that an official "recklessly failed to act with
reasonable care to mitigate the risk that the condition posed to
the pretrial [detainee] even though the defendant-official knew,

or should have known, that the condition posed an excessive risk
to health or safety." <u>Darnell</u>, 849 F.3d at 35.

### 1.

The plaintiff has failed to allege plausibly that he was
infected with hepatitis A, B, or C at any point when he was held
in City or State custody.

### i.

In his complaint, the plaintiff alleges that the City and
State Defendants failed to inform him of his diagnosis for
hepatitis A, B, and C. Compl. 7, ¶ 1. His claims against the
City Defendants only relate to not being notified that he was
infected with and not being treated for hepatitis C. <u>Id.</u> at 2,
¶ 4 – 10, ¶ 13. The plaintiff mentions that he declined to get a
hepatitis B vaccine when he was seen by Dr. Petermann. The
plaintiff does not again mention hepatitis A or B in his claims
against the City Defendants and none of his allegations relating
to the City Defendants discuss lab results for hepatitis A or B.
Accordingly, the plaintiff's claims against the City Defendants
concerning the denial of care for hepatitis A and B are
**dismissed.**

### ii.

The plaintiff's medical records reveal that the plaintiff
did not have hepatitis C when he was in the City's custody. On
December 7, 2014, when the plaintiff was in the care of the

City, the plaintiff tested positive for hepatitis C antibodies. The antibody test tells a patient if the patient has ever been infected with hepatitis C. See "Viral Hepatitis: Questions and Answers for the Public," CDC, https://www.cdc.gov/hepatitis/hcv/cfaq.htm (last visited March 6, 2020).[4] A hepatitis C anti-body test that comes back as reactive or positive means that hepatitis C antibodies were found in the blood, and a person was infected with the hepatitis C virus at some point in time. Id. A reactive antibody test does not necessarily mean a person has hepatitis C, because once someone has been infected, they will always have antibodies in their blood; this is true if even if a person has cleared the hepatitis C virus. Id. The plaintiff states that he was previously diagnosed with hepatitis C in 1995; this suggests that the plaintiff will always test positive for hepatitis C antibodies, even if he doesn't have a current infection.

On December 14, 2014, after the plaintiff tested positive for hepatitis antibodies, Dr. Petermann ordered a confirmatory RNA test. A virus RNA test is the second type of blood test used to test for hepatitis C and tells a patient if the patient has a

---

[4] Pursuant to Rule 201(b) of the Federal Rules of Evidence, the Court takes judicial notice of the following background information on hepatitis A, B, and C and their diagnoses, taken from the CDC website. See McDonnell v. First Unum Life Ins. Co., No. 10-CV-8140, 2013 WL 3975941, at *16 n.33 (S.D.N.Y. Aug. 5, 2013) (taking judicial notice of background information on Lyme Disease, its diagnosis, and its treatment taken from the CDC website).

current infection with the virus. Id. In his review of the plaintiff's medical files on May 12, 2015, P.A. LaRosa wrote "abn HCV antibody EIA but normal HCV RNA qualitative bDNA." Compl. 48. If a person's test results show that they have positive hepatitis C antibodies, and hepatitis C virus RNA is not detected, there is no current hepatitis C infection and, in most cases, no further action is required. See "Interpretation of Results of Tests for Hepatitis C Virus (HCV) Infection and Further Actions," CDC, https://www.cdc.gov/hepatitis/hcv/pdfs/hcv_graph.pdf (last visited March 6, 2020). Accordingly, on May 12, 2015, the plaintiff had antibodies from hepatitis C in his system, but did not have an active hepatitis C infection.

### iii.

The plaintiff's medical records reveal that the plaintiff did not have hepatitis A when he was in the State's custody. The diagnosis of hepatitis A cannot be made on a clinical basis alone and requires blood testing. "The Pink Book: Hepatitis A," CDC, https://www.cdc.gov/vaccines/pubs/pinkbook/hepa.html (last visited March 6, 2020). An antibody test that comes back as positive for Immunoglobulin M (IgM) antibodies confirms that a patient is infected with the hepatitis A virus. See "Hepatitis A Questions and Answers for Health Professionals," CDC, https://www.cdc.gov/hepatitis/hav/havfaq.htm (last visited March

6, 2020). When a person is infected with hepatitis A, their bodies produce IgG antibodies, which provide lifelong protection against hepatitis A. Id. A separate test, the total antibody hepatitis A test, screens for the presence of both IgM and IgG antibodies. See The Pink Book: Hepatitis A. "Persons who are total anti-HAV positive and IgM anti-HAV negative have serologic markers indicating immunity consistent with either past infection or vaccination." Id.

The plaintiff's August 7, 2015 lab test results show that his blood was negative for IgM antibodies, meaning that he did not have an active infection of hepatitis A. His positive test result for the total antibody test indicates that he either had a past infection or vaccination, and is now immune. Accordingly, on August 7, 2015, the plaintiff was also not infected with hepatitis A. Furthermore, in an ambulatory health record in April, 2017, Dr. Nguyen noted that the plaintiff was, "Hep 'A' Immune."

iv.

The plaintiff's medical records reveal that the plaintiff did not have hepatitis B when he was in the State's custody. The diagnosis of hepatitis B also cannot be made on a clinical basis alone and requires blood testing. "The Pink Book: Hepatitis B," CDC, https://www.cdc.gov/vaccines/pubs/pinkbook/hepb.html (last

visited March 6, 2020). There are many different blood tests available to diagnose hepatitis B, including the total hepatitis B core antibody, the hepatitis B surface antibody, and the hepatitis B surface antigen. See "Hepatitis B Questions and Answers for the Public," CDC, https://www.cdc.gov/hepatitis/hbv/bfaq.htm#bFAQf01 (last visited March 6, 2020). A positive result for the core antibody test means a person is either currently infected with the hepatitis B virus or was infected in the past but has cleared the infection. Id. A positive result for the surface antibody test means a person is protected or immune from hepatitis B either because he was successfully vaccinated or because he cleared the virus and recovered from an acute infection, and cannot get hepatitis B again. Id. A negative result for the surface antigen test means that a person does not have the hepatitis B virus in his blood. Id.

The plaintiff tested positive for the core antibody test, positive for the surface antibody test, and negative for the surface antigen test. These results, taken from his August 7, 2015 lab report, indicate that he was immune due to past natural infection. See "Interpretation of Hepatitis B Serologic Test Results," CDC, https://www.cdc.gov/hepatitis/hbv/pdfs/serologicchartv8.pdf (last visited March 6, 2020). Accordingly, on August 7, 2015,

the plaintiff was also not infected with hepatitis B.
Furthermore, in an ambulatory health record in April, 2017, Dr.
Nguyen noted that the plaintiff was, "Hep 'B' Immune 8/14/95."

**v.**

The plaintiff's medical records reveal that the plaintiff
did not have hepatitis C when he was in the State's custody.
When the plaintiff was received in state custody in August,
2015, he was seen by Dr. Malvarosa and was again given an
antibody test for hepatitis C. The lab report, dated August 7,
2015, showed that the plaintiff had hepatitis C antibodies, at a
s/co ratio of 30.80. The lab report also showed that the
plaintiff's blood was also tested with an RNA test, which came
back as normal. The hepatitis C RNA test came back as "<15 ND,"
which means "Not Detected." Compl. 74. Accordingly, because the
plaintiff's test results showed that he had positive hepatitis C
antibodies but hepatitis C virus RNA is not detected, the
plaintiff did not have a hepatitis C infection on August 7, 2015
and the State Defendants did not need to take further action.
Furthermore, in an ambulatory health record in April, 2017, Dr.
Nguyen noted that the plaintiff had completed medication for
hepatitis C in 2005, and that hepatitis C had a "Sustained Viral
Response." A patient who has had hepatitis C may be cured of HCV
infection if they achieve sustained virologic response (SVR),
defined as "the absence of detectable virus 12 weeks after

completion of treatment." "Hepatitis C Questions and Answers for Health Professionals," CDC, https://www.cdc.gov/hepatitis/hcv/hcvfaq.htm. SVR is indicative of a cure of HCV infection. Id.

**2.**

The plaintiff's claims that the City and State Defendants exhibited deliberate indifference to his medical needs fail under the objective prong. The plaintiff has failed to make a plausible showing that he was in fact suffering from hepatitis A, B, or C. Because the City Defendants determined that the plaintiff did not have hepatitis C and the State medical providers determined that the plaintiff did not have hepatitis A, B, or C while the plaintiff was in custody, the plaintiff has not adequately alleged that he had a condition of urgency, for which he was deprived of medical care.

**3.**

The plaintiff has also failed to show that the defendants acted with a sufficiently culpable state of mind. Because the plaintiff did not have hepatitis C, there was no reason that the City Defendants should have known that there was any excessive risk to the plaintiff's health. Similarly, because the plaintiff did not have hepatitis A, B, or C, there was no possibility that the State medical providers were actually aware that serious harm would result from a lack of treatment for hepatitis. The

plaintiff is thus unable to show that the defendants exhibited the mens rea of objective recklessness required by the Fourteenth Amendment and criminal recklessness required by the Eighth Amendment.

Furthermore, the gist of the plaintiff's claims is that he disagrees with the defendants on how to analyze his medical records and to diagnose hepatitis. The CDC website notes that a person who has been infected with hepatitis C and cleared the virus or who has been successfully treated and cured can still be re-infected with the hepatitis C virus. See "Viral Hepatitis: Questions and Answers for the Public." To the extent that the plaintiff was improperly diagnosed as being cured of hepatitis C, negligence in diagnosis or medical malpractice are also not bases to state a deliberate indifference claim. See Figueroa, 2018 WL 3315735, at *5 ("[M]edical malpractice will not rise to the level of a [Fourteenth Amendment] violation unless the medical malpractice contains an element of intent or recklessness."); Estelle v. Gamble, 429 U.S. at 105-06 (negligence in diagnosing a medical condition and medical malpractice do not state valid claims of medical mistreatment under Eighth Amendment); Whitfield v. O'Connell, 402 F. App'x 563, 566 (2d Cir. 2010) (affirming motion to dismiss plaintiff's claims of deliberate indifference, which rested on a disagreement between the plaintiff and medical providers as to

whether his lab reports demonstrated that he suffered from urinary tract infection). Accordingly, the plaintiff's claims for deliberate indifference to his medical needs caused by hepatitis A, B, and C are **dismissed.**

**4.**

The plaintiff also alleges that when he was in the custody of the City and of the State, he suffered other symptoms including nausea, loss of appetite, abdominal pains, fatigue, fever, night sweats, headaches, and rashes. He explained this to medical providers in December, 2014 and July, 2015 while he was in the City's custody, and to State medical providers at Downstate Correctional Facility, Auburn Correctional Facility, and Green Haven Correctional Facility from 2015 to 2018 while he was in the State's custody. He has similarly failed to allege that he was deprived of medical care for these symptoms and that the doctors were deliberately indifferent to his needs.

The plaintiff states in his complaint that he was seen by the City Defendants about these symptoms at least three times and was prescribed medication for certain symptoms. This suggests that the City Defendants did not fail to act to mitigate any risk that these conditions posed to the plaintiff.

The plaintiff explains in his complaint that he was seen on multiple occasions after August, 2015, by Drs. Ryerson, McCarthy, Greer, Ripich, and Kim. The plaintiff discussed with

the providers his symptoms relating to stomach pains, irritating rashes, a lump in his abdomen, and other flu-like symptoms like loss of appetite, nausea, fatigue, fever, night sweats, and headaches. The plaintiff admits that the doctors prescribed medication for shampoo and cream for the rash, medicine for ulcers, and recommended a flu shot. Each doctor reviewed the plaintiff's medical records and said that they saw nothing wrong with him. This also indicates that the State medical providers did not act or fail to act while aware that substantial risk of harm to the plaintiff would result.[5]

Furthermore, the medical providers at issue were diligent in their evaluation and treatment of the plaintiff. The providers reviewed the plaintiff's medical records, came to conclusions about his symptoms, and prescribed some medications. For example, P.A. LaRosa prescribed aspirin, Norvasc, and DermaVantage lotion. Dr. Ryerson reviewed the plaintiff's records and said that there nothing was wrong with him. Dr. Kim thought that the plaintiff was cured of hepatitis C. The plaintiff states that he received the same medication from Dr. Ryerson and from Dr. Kim for his rashes. However, "mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is

---

[5] Because the plaintiff has failed to allege that he was actually deprived of care for these symptoms, it is not necessary to reach whether a deprivation of care for each of these symptoms would be considered serious.

adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998). The City Defendants and State medical providers did not fail to act to remedy the plaintiff's symptoms and did not show deliberate indifference to the plaintiff's medical needs. Accordingly, the plaintiff has failed to state a claim under the Fourteenth and Eighth Amendments.

**B.**

The plaintiff also brings Eighth Amendment claims against two supervisory state employees who were not directly involved in the provision of medical care to the plaintiff.

Supervisory officials may not be held responsible in a Section 1983 action unless they were personally involved in the alleged constitutional violations. See Grullon v. City of New Haven, 720 F.3d 133, 138 (2d Cir. 2013); Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003) (per curiam). Supervisor liability under Section 1983 may be shown if "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly

negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).[6]

The plaintiff first alleges that Dr. Koenigsmann has an unwritten policy of denying medical care that is too expensive, and that this policy indicates a deliberate indifference to the plaintiff's medical needs. This appears to allege liability under Colon's third factor. The plaintiff's allegations are conclusory and bereft of factual allegations about Dr. Koenigsmann's personal conduct that would allow the Court to weigh the plausibility of his claims. Moreover, the suggestion of a policy of lack of medical care is contrary to the allegations in the complaint detailing the care provided to the plaintiff.

The plaintiff also alleges that Dr. Koenigsmann violated his Eighth Amendment rights because Dr. Koenigsmann did not respond to the plaintiff's grievances. This seems to allege

---

[6] The Court of Appeals for the Second Circuit has noted that Ashcroft v. Iqbal, 556 U.S. 662 (2009), may have heightened the pleading requirements for showing a supervisor's personal involvement with respect to constitutional violations. See Grullon, 720 F.3d at 139. Courts have disagreed about whether the five factors announced in Colon may still be used as bases for liability under Section 1983. See e.g., Lebron v. Mrzyglod, No. 14-CV-10290, 2017 WL 365493, at *5 (S.D.N.Y. Jan. 24, 2017) (collecting cases). The Court does not need to reach what impact Iqbal had on Colon, because the complaint has not adequately alleged the involvement of Dr. Koenigsmann and Collado even under the Colon standard.

liability under Colon's second and fifth factors. A prisoner's allegation "that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations." Allah v. Annucci, No. 16-CV-1841, 2018 WL 4571679, at *6 (S.D.N.Y. Sept. 24, 2018); see also Luck v. Westchester Med. Ctr., No. 17-CV-9110, 2020 WL 564635, at *11 (S.D.N.Y. Feb. 4, 2020) (collecting cases). The plaintiff only alleges that Dr. Koenigsmann did not respond to his grievance, which the plaintiff had requested be sent to Dr. Koenigsmann; the lack of a response does not establish that Dr. Koenigsmann received the grievance and ignored it or that Dr. Koenigsmann acted with deliberate indifference to the plaintiff's medical needs. Accordingly, the plaintiff's claims against Dr. Koenigsmann are **dismissed.**

The plaintiff also claims that Collado violated his Eighth Amendment rights by denying his grievance, which caused a delay in his receiving proper medical care. Prison administrators may rely on opinions of medical personnel when evaluating the proper care to be administered to prisoners, and cannot be held to have been personally involved based on this analysis. See Joyner v. Greiner, 195 F. Supp. 2d 500, 506 (S.D.N.Y. 2002) (dismissing claim against Superintendent who affirmed dismissal of prisoner's grievance); Manley v. Mazzuca, No. 01-CV-5178, 2007

WL 162476, at *10-11 (S.D.N.Y. Jan. 19, 2007). Collado was not directly involved in providing medical care to the plaintiff. Collado responded to the grievance that the plaintiff filed and made a decision based on a review of the medical record and the results of N.A. Carey's investigation. Collado cannot be held liable for responding to the grievance and issuing an assessment. That the plaintiff did not agree with Collado's assessment is not a basis for a constitutional violation; the proper avenue for the plaintiff to address his disagreement with Collado's findings was to file an appeal, which he did on August 31, 2017. Accordingly, the plaintiff's claims against Collado are **dismissed**.

## C.

The plaintiff next argues that Correction Officer McNeil violated his Eighth Amendment rights by disclosing his hepatitis C status, which was confidential information, to other prisoners, and by confiscating his civil rights complaint.

## 1.

The Court of Appeals for the Second Circuit has held that the Fourteenth Amendment Due Process Clause protects an inmate's right to the confidentiality of medical information for certain medical conditions. See Powell v. Schriver, 175 F.3d 107, 111-12 (2d Cir. 1999); Matson v. Bd. of Educ. of City Sch. Dist. of New York, 631 F.3d 57, 63-64 (2d Cir. 2011) (characterizing

constitutional right to privacy as right to confidentiality, which includes right to protection regarding information about the state of one's health). Confidential medical conditions are conditions that are "excruciatingly private and intimate [in] nature" and are "likely to provoke both an intense desire to preserve one's medical confidentiality, as well as hostility and intolerance from others." Powell, 175 F.3d at 112. Courts have found that the right to confidentiality of medical information extends to medical conditions like HIV, transsexualism, and sickle cell anemia. See id. at 112 (transsexualism); Doe v. City of New York, 15 F.3d 264, 267 (2d Cir. 1994) (HIV); Fleming v. State Univ. of New York, 502 F. Supp. 2d 324, 343 (E.D.N.Y. 2007) (sickle cell anemia). The Court of Appeals for the Second Circuit has declined to extend this privacy right to serious medical conditions that do not lead to societal discrimination or intolerance. See Matson, 631 F.3d at 67-68 (declining to extend right to privacy to fibromyalgia). Although hepatitis C is a serious medical condition, it is not the type of highly sensitive condition that would engender the intense desire to preserve one's medical confidentiality or hostility and intolerance from others that form the bases for constitutional protections for conditions such as HIV or transsexualism. See Watson v. Wright, No. 9:08CV62, 2010 WL 55932, at *1 (N.D.N.Y. Jan. 5, 2010) (no constitutional protection for hepatitis C).

Moreover, the plaintiff has not alleged that the disclosure of his alleged diagnosis of hepatitis C caused him to face stigma or intolerance from any inmate or prison official. The plaintiff's complaint states only that one other inmate heard McNeil shouting to other prisoners that the plaintiff had hepatitis C. Accordingly, because the Constitution does not contain a right to privacy of medical information relating to hepatitis C, the plaintiff's claim that McNeil violated his constitutional right to privacy is **dismissed.**

### 2.

The plaintiff also alleges that McNeil violated his rights by confiscating his civil rights complaint and delayed his efforts to pursue his legal claim. "It is well established that all persons enjoy a constitutional right of access to the courts, although the source of this right has been variously located in the First Amendment right to petition for redress, the Privileges and Immunities Clause of Article IV, section 2, and the Due Process Clauses of the Fifth and Fourteenth Amendments." Monsky v. Moraghan, 127 F.3d 243, 246 (2d Cir. 1997). "To state a denial-of-access-to-the-courts claim, a prisoner must show that: (1) he suffered an 'actual injury,' (2) to a non-frivolous legal claim, (3) concerning his criminal conviction, habeas corpus petition, or conditions of confinement." Kaminski v. Semple, No. 19-973-CV, 2019 WL 6904145

(2d Cir. Dec. 18, 2019) (citing <u>Lewis v. Casey</u>, 518 U.S. 343, 350 (1996)). The requirement of actual injury "derives ultimately from the doctrine of standing." <u>Monsky</u>, 127 F.3d at 247.

The plaintiff has not shown that McNeil's actions actually hindered his efforts to pursue a legal claim. When the plaintiff filed a grievance, he requested the return of his confiscated legal papers. The investigation revealed that his paperwork had been placed into a plastic bag and had already been put together with the plaintiff's property. Compl. 104. The plaintiff was also not hindered from filing his complaint in a timely fashion in this case. <u>See</u> <u>Johnson v. Woods</u>, No. 07-CV-1018, 2010 WL 2039164, at *17 (N.D.N.Y. Mar. 2, 2010), <u>report and recommendation adopted</u>, No. 9:07-CV-1018, 2010 WL 2039019 (N.D.N.Y. May 21, 2010) (plaintiff alleged no actual injury from confiscation of papers when he successfully participated in motion practice). Accordingly, the plaintiff has not shown that he suffered an actual injury and fails to state a claim of denial of access to the courts against McNeil.

## V.

The defendants are also entitled to qualified immunity. Qualified immunity generally protects government officials when performing discretionary functions "from liability for civil damages" if "their conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see also Plumhoff v. Rickard, 572 U.S. 765, 778-79 (2014); Malley v. Briggs, 475 U.S. 335, 341 (1986) ("As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law."); see also Berman v. Williams, No. 17-CV-2757, 2019 WL 4450810, at *7 (S.D.N.Y. Sept. 17, 2019). If the plaintiff has not shown that a government official violated a statutory or constitutional right, no further inquiries concerning qualified immunity are required. See Mara v. Rilling, 921 F.3d 48, 68 (2d Cir. 2019). This is "because a defendant has no need for an immunity shield where there is no viable constitutional claim." Id.

As explained above, the complaint does not allege facts sufficient to demonstrate that the plaintiff's constitutional rights were violated by any of the defendants. Therefore, the City and State Defendants are entitled to immunity from the plaintiff's claims.

**VI.**

In paragraph 4 of his complaint, plaintiff references that he seeks injunctive relief and damages pursuant to the Americans with Disabilities Act ("ADA") and the Rehabilitation Act. Compl. 4, ¶ 1. "[N]either Title II of the ADA nor § 504 of the

34

Rehabilitation Act provides for individual capacity suits against state officials." <u>Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn</u>, 280 F.3d 98, 107 (2d Cir. 2001) (collecting cases). Therefore, the plaintiff's ADA and Rehabilitation Act claims against the City and State Defendants in their individual capacities are **dismissed**.

Courts have disagreed over whether a defendant is subject to suit under the ADA and the Rehabilitation Act in the defendant's official capacity. <u>See</u> <u>Scalercio-Isenberg v. Port Auth. of New York</u>, No. 16-CV-8494, 2018 WL 1633767, at *5 (S.D.N.Y. Mar. 31, 2018) (collecting cases); <u>see also</u> <u>Monroe v. Gerbing</u>, No. 16-CV-2818, 2017 WL 6614625, at *15 (S.D.N.Y. Dec. 27, 2017) (noting that this issue is unsettled in the Second Circuit). Whether a defendant is subject to suit in his or her official capacity does not need to be addressed to decide this motion, because the plaintiff fails to state a claim under either statute.[7] The standards under both statutes are generally the same and claims under the two statutes are treated identically. <u>See</u> <u>Wright v. New York State Dep't of Corr.</u>, 831

---

[7] Title II of the ADA requires that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the Rehabilitation Act requires that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a).

F.3d 64, 72 (2d Cir. 2016) (internal quotation marks and citations omitted). To state a claim under Title II of the ADA, a prisoner must show that (1) he is a qualified individual with a disability; (2) he is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his disability; and (3) the entity that provides the service, program, or activity is a public entity. See Hallett v. New York State Dep't of Corr. Servs., 109 F. Supp. 2d 190, 198 (S.D.N.Y. 2000). To state a claim under Section 504 of the Rehabilitation Act, a prisoner must establish that: (1) he is a qualified individual with a disability; (2) he is otherwise qualified to participate in the offered activity or program or to enjoy the services or benefits offered; (3) he is being excluded from participation or enjoyment solely by reason of his disability; and (4) the entity denying the inmate participation or enjoyment receives federal financial assistance. See id. As described above, the plaintiff was never diagnosed with hepatitis A, B, or C when he was in the custody of the City of New York and State of New York. Accordingly, he has failed to show that he is a qualified individual with a disability.

Moreover, the plaintiff has not alleged that he was excluded from participation in any program or activity because of his disability. "Courts routinely dismiss ADA suits by disabled inmates that allege inadequate medical treatment, but

do not allege that the inmate was treated differently because of his or her disability." Elbert v. New York State Dep't of Corr. Servs., 751 F. Supp. 2d 590, 595 (S.D.N.Y. 2010) (collecting cases). The gist of the plaintiff's claims is that he was denied notice about his diagnosis and was not provided adequate medical treatment for hepatitis A, B, and C, not that he was denied participation in some activity or program because of his positive hepatitis status. The plaintiff therefore has no cause of action under the ADA or the Rehabilitation Act. See Maccharulo v. New York State Dep't of Corr. Servs., No. 08-CV-301, 2010 WL 2899751, at *5 (S.D.N.Y. July 21, 2010) ("[N]either the ADA nor Rehabilitation Act provides a cause of action for challenges to the quality of health services provided or for allegations of negligent medical malpractice."). Accordingly, the plaintiff's ADA and Rehabilitation Act claims are **dismissed.**

## VII.

The plaintiff also seeks declaratory and injunctive relief. However, when a prisoner has been released from prison, his claims seeking declaratory and injunctive relief are rendered moot because he no longer has a "continuing personal stake" in the outcome of the action. See Muhammad v. City of New York Dep't of Corr., 126 F.3d 119, 123 (2d Cir. 1997); Khalil v. Laird, 353 F. App'x 620, 621 (2d Cir. 2009) (pro se prisoner's

claims for declaratory and injunctive relief moot after he was released during the pendency of the action).

In his complaint, the plaintiff attaches a letter from the BRC Assessment Center, a homeless shelter located in Brooklyn, New York. Compl. 31. The letter certifies that the plaintiff has been a resident of the shelter since October 13, 2018. Id. Because the plaintiff is no longer incarcerated, his claims for injunctive and declaratory relief against the City and the State Defendants are moot and are **dismissed.**

**CONCLUSION**

The Court has considered all the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. For the reasons explained above, the City Defendants' and the State Defendants' motions to dismiss are **granted** and the plaintiff's claims are **dismissed without prejudice** to the filing of an Amended Complaint. The plaintiff may file a motion to file an amended complaint within sixty days of the date of this Order, showing how the amended complaint will cure the numerous defects identified above. The Clerk is directed to close all pending motions.

**SO ORDERED.**

**Dated:    New York, New York**
**          March 24, 2020**

                                        /s/ John G. Koeltl
                                    **John G. Koeltl**
                            **United States District Judge**